L82WdepS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   UNITED STATES OF AMERICA,
4            v.                            19 Cr. 833 (SHS)
5   JOSEPH DEPAOLA,
       a/k/a "Joe Hall,"
6
                   Defendant.
7                                          Sentence
    ------------------------------x
8
                                           New York, N.Y.
9                                          August 2, 2021
                                           3:30 p.m.
10
11  Before:
12
                         HON. SIDNEY H. STEIN,
13
                                           District Judge
14
                              APPEARANCES
15
    AUDREY STRAUSS
16       United States Attorney for the
         Southern District of New York
17  BY:  KIERSTEN A. FLETCHER
         Assistant United States Attorney
18
    ZACHARY MARGULIS-OHNUMA
19       Attorney for Defendant
20
21
22
23
24
25
```

L82WdepS

1              (Case called; appearances noted)

2              THE COURT:  Good afternoon to all of you.  Please be

3    seated.

4              I have the presentence report, dated March 26 and

5    revised on April 19 of this year, along with the addendum and

6    the sentencing recommendation.  At an offense level of 22,

7    criminal history category of III, guideline range of 51 to 63

8    months, there's a recommendation by the probation department of

9    36 months as a variance.

10             I also have the letters of the defense firm, dated

11   July 19, along with its various letters and attachments,

12   records and so forth, and the submission of the defense team,

13   dated July 30.  I have the government letter, dated July 22,

14   listing the government's view of relative culpability of people

15   in the conspiracy.

16             Is there any additional information I should have?

17             Defense.

18             MR. MARGULIS-OHNUMA:  No, but I think you omitted one

19   of the government's letters.

20             Nothing more for the defense.

21             THE COURT:  Government.

22             MS. FLETCHER:  That's right, your Honor.  There's also

23   a submission, dated July 26, 2021, which was the government's

24   sentencing submission for both Derek Larkin and Joseph

25   DePaola.

L82WdepS

1      THE COURT:  Oh, yes, I happened to put that in the

2  pile with the Larkin sentencing.  Hand that up, though, just so

3  that I have it in front of me.  I'll ignore any interlineations

4  you may have on your copy.

5      MS. FLETCHER:  There are none, Judge.  It's a clean

6  copy, but it's my only one, so hopefully I won't have to refer

7  to it.  And in addition to that submission, I handed up to

8  Ms. Blakely at the beginning of the conference a signed consent

9  forfeiture order for the Court's consideration.

10      THE COURT:  Thank you.

11      I'm handing the government's copy back.

12      MS. FLETCHER:  Thank you.

13      THE COURT:  Yes, I did see this in connection with

14  Mr. Larkin's sentencing earlier today, but now that I look at

15  your footnote, it's a little different -- in ECF document 312.

16  It's a little bit different than I was thinking, so let's

17  handle it.

18      What I was going to do, and I thought the parties were

19  agreed that it's not a criminal history category III but,

20  rather, criminal history category II; that is, total offense

21  level of 22, criminal history category II, guideline range of

22  46 to 57.

23      Are we agreed upon that?

24      Defense.

25      MR. MARGULIS-OHNUMA:  Yeah, we objected to the two

L82WdepS

| | |
|---|---|
| 1 | criminal history-point increase for committing an offense while |
| 2 | on a sentence of probation. |
| 3 | THE COURT:  Yes, and I thought the government agreed |
| 4 | with that. |
| 5 | MR. MARGULIS-OHNUMA:  And it does, I think. |
| 6 | THE COURT:  All right. |
| 7 | MR. MARGULIS-OHNUMA:  Yes. |
| 8 | THE COURT:  So let's take it step by step.  Defense, |
| 9 | you agree that it's a total offense level of 22, criminal |
| 10 | history category II, guideline range of 46 to 57, correct? |
| 11 | MR. MARGULIS-OHNUMA:  Now I'm questioning myself about |
| 12 | the criminal history category because the government's letter |
| 13 | says that it's one criminal history point. |
| 14 | THE COURT:  That's exactly what just caught my |
| 15 | attention. |
| 16 | MS. FLETCHER:  Yeah. |
| 17 | THE COURT:  What I think, although we'll hear what the |
| 18 | parties think, is that there's one criminal history point under |
| 19 | paragraph 48 for theft by unlawful taking, a Bergen County |
| 20 | case, for which he received two years' probation.  And one |
| 21 | point under paragraph 49, for prowling to obtain a controlled |
| 22 | substance in the same county.  That's two points.  He did not |
| 23 | commit the instant offense while under a criminal justice |
| 24 | sentence of probation, and therefore, I was going to strike |
| 25 | paragraph 51 and amend paragraph 52 to say the criminal history |

L82WdepS

1    category score is two and the criminal history category is II,

2    accordingly.  However, the government's footnote, I think, is

3    incorrect.

4              MS. FLETCHER:  It is incorrect, your Honor.

5              THE COURT:  All right.

6              MS. FLETCHER:  The guidelines calculation as just set

7    forth by the Court is correct and consistent with the plea

8    agreement.

9              THE COURT:  All right.  Fine.

10             Defense, I think we're all agreed, but let's clear it

11   up.

12             MR. MARGULIS-OHNUMA:  Much as I would love to

13   capitalize on that error, I don't think I can and I think I'm

14   in agreement.

15             THE COURT:  All right.  Again, we all seem to be in

16   agreement that the criminal history category score is two, and

17   therefore, the criminal history category is II, and on the

18   total offense level of 22, criminal history score -- criminal

19   history category of II, the guideline range is 46 to 57.

20             Are we agreed, defense?

21             MR. MARGULIS-OHNUMA:  Yes, your Honor.

22             THE COURT:  Are we agreed, government?

23             MS. FLETCHER:  Yes, your Honor.

24             THE COURT:  All right.  Then, all right.  Let's go

25   back.

L82WdepS

| | |
|---|---|
| 1 | I have the consent preliminary order of forfeiture |
| 2 | presented to me now, and I have ECF document 312, which is the |
| 3 | government letter in regard to both Mr. Larkin and Mr. DePaola. |
| 4 | With those additions, is there anything else the defense wants |
| 5 | me to have in written form? |
| 6 | MR. MARGULIS-OHNUMA:  No, your Honor. |
| 7 | THE COURT:  Government. |
| 8 | MS. FLETCHER:  No, your Honor. |
| 9 | THE COURT:  Defendant, have you read -- that is, |
| 10 | defense counsel -- have you read and discussed all of this |
| 11 | information with your client, and do either of you have any |
| 12 | objections to the findings of fact in the presentence report? |
| 13 | MR. MARGULIS-OHNUMA:  I have reviewed it with my |
| 14 | client.  I don't have any remaining objections, your Honor. |
| 15 | THE COURT:  All right. |
| 16 | Government, any objections to the findings of fact? |
| 17 | MS. FLETCHER:  No, your Honor. |
| 18 | THE COURT:  All right.  I'm adopting the findings of |
| 19 | fact with the changes I just said -- that is, I'm deleting |
| 20 | paragraph 51, although let's not renumber anything.  By 51 just |
| 21 | put "deleted by the Court."  And then in 52, the last word |
| 22 | should be, instead of Roman numeral III, it should be Roman |
| 23 | numeral II, and then the first sentence of paragraph 52, it |
| 24 | should read "total criminal history score is two." |
| 25 | Now that I've confused things, let me state it |

L82WdepS

1    clearly.

2           Paragraph 51 is deleted.

3           Paragraph 52 is amended to read as follows:

4           The total criminal history score is two.  According to

5    the sentencing table, U.S.S.G. chapter 5.A, criminal history

6    score of two establishes a criminal history category of Roman

7    numeral II.

8           All right.  I have the consent preliminary order of

9    forfeiture, ordering that the defendant forfeit $400,000, and I

10   am signing that.

11          All right.  Mr. Margulis-Ohnuma, speak to me.

12          MR. MARGULIS-OHNUMA:  Thank you very much, your Honor.

13          I won't reiterate everything I said in the papers,

14   which I think paint a portrait of a young man who went astray,

15   who was manipulated into going astray.

16          THE COURT:  You mean he committed crimes.  Isn't that

17   what you mean?

18          MR. MARGULIS-OHNUMA:  Yeah.

19          THE COURT:  All right.

20          MR. MARGULIS-OHNUMA:  That's exactly what I mean.

21   Stole money from old people.  There's no question about that.

22          THE COURT:  Not only that, he wasn't just a salesman,

23   he was a closer.  He didn't run the sales floor, to his credit,

24   but they brought him in.  He was the sandman.  When somebody

25   was reluctant, he was a skilled salesman and he closed the

L82WdepS

1    deal.

2            MR. MARGULIS-OHNUMA:  Well, he's a pretty articulate

3    guy.  He has a learning disability so he didn't do well in

4    school and had trouble getting real jobs.  His AA sponsor, you

5    know, after years and years of drug addiction, he was brought

6    out to it and led to the light through AA and his sponsor.

7            THE COURT:  His sponsor was Hult and took advantage of

8    him.

9            MR. MARGULIS-OHNUMA:  Correct, and he did that

10   initially, which I'm not sure is reflected in our papers, by

11   recruiting him to work as a landscaper, you know, outside

12   getting sweaty, working hard.  He liked that; it was OK.  And

13   he went on to recruit him, I guess, realizing how articulate he

14   was and embarking on the scheme, Mr. Hult, realizing how

15   articulate he was and what an asset he could be to the scheme

16   that Hult was hatching, he first recruited him to some sort of

17   cryptocurrency business that failed after a month or two, and

18   then to the, this business opportunity sales floor.  And I

19   think Mr. DePaola was willfully blind to that.  There's no

20   question about it.

21           THE COURT:  No.  He attended the Ketabchi trial.

22           MR. MARGULIS-OHNUMA:  Yeah.

23           THE COURT:  He was friends with the Ketabchis.  He

24   knew --

25           MR. MARGULIS-OHNUMA:  No.  Well, hang on.  He didn't

L82WdepS

1    know the Ketabchis.

2              THE COURT:  I'm sorry.  People involved with --

3              MR. MARGULIS-OHNUMA:  One person.  It was his

4    childhood friend.  He didn't meet that person through the

5    scheme.  So I think that's important to point out.

6              THE COURT:  All right.

7              MR. MARGULIS-OHNUMA:  He knew that guy, Owimrin, as a

8    child, and actually after Joseph's father died, he rekindled

9    his friendship with Andrew Owimrin, and then just a few months

10   after starting to work at, you know, after working for Hult as

11   a landscaper for a year, a few months after starting to work

12   for him in the sales floor, the Ketabchi trial was happening,

13   and he went to one day.

14             And we understand the look there, and that the

15   government was aware of it.  He never denied going to that

16   trial.  He admitted that in his postarrest interview when he

17   waived his Miranda rights, but we went back and looked at the

18   transcript from the day he went to, and I'm not sure that --

19   look, I'm not -- I don't want to deny the criminal culpability.

20   He was willfully blind.  There's no question about it, but it's

21   not quite as stark as it sounds.  He didn't see the

22   government's opening statement, and I think there was a

23   misstatement in my initial sentencing brief before I looked

24   through everything, you know, before we looked through the

25   testimony from the day he attended.

L82WdepS

1          He didn't really hear the government's case.  What he

2    heard was one of the codefendants testifying in his own defense

3    and being cross-examined by the government.  So I don't -- I

4    think, yeah, he was willfully blind to what they were doing.

5    The legality of it, you know, he was assured it was legal.  He

6    wanted to believe that.  He was making more money than he'd

7    ever made in his life.  His family owned a bagel store growing

8    up.  Sometimes the bagel business was bleak and they struggled.

9    Sometimes it was better.  He had worked as a landscaper.  He

10   had not done well in school because of his learning disability.

11   He was using a skill that he had for, in a bad way, that he

12   knew was bad, but I hope in thinking about the entire person,

13   that his overall moral culpability will come through as

14   somewhat less than typical in the scheme as a whole.  And I

15   think that's actually reflected.

16          Another thing I want to add that's not in my papers is

17   in the government's July 22 letter, ECF No. 309, there is the

18   list of defendants integrated with the Ketabchi defendants, and

19   I didn't realize this because I read it too quickly before, but

20   now I understand that it's not only in tiers but it's in order.

21   So Mr. DePaola, yes, he was a closer, but I think even the

22   government sees him at the very bottom of tier 3.  And that's

23   because his time working in the offense was relatively limited.

24   His role in the offense was limited in the sense that he didn't

25   have contact after the sale was made, so he didn't know quite

L82WdepS

1   how badly the customers were being treated.  And that, it just

2   goes to his overall --

3               THE COURT:  He didn't have his own merchant account.

4               MR. MARGULIS-OHNUMA:  Correct.  He did not have his

5   own merchant account.

6               THE COURT:  He was doing well in AA.

7               MR. MARGULIS-OHNUMA:  He's doing fantastically well in

8   AA, and he's going to tell you in a minute about sobriety and

9   what it means and what it means to him and physical versus

10  spiritual or emotional sobriety.  And he didn't get there when

11  he was committing this crime, but I'm here to tell you today he

12  got there now, that this was a wake-up call for him.  He

13  immediately waived his Miranda rights and engaged in an

14  interview with the FBI.  He immediately directed me to seek

15  cooperation with the government, and he proffered a couple of

16  times.

17              THE COURT:  I saw that.

18              MR. MARGULIS-OHNUMA:  Yeah, and I think the only

19  reason that he was -- well, the government can tell you this,

20  but I hope they'll tell you that the reason he wasn't signed up

21  and didn't have a cooperation agreement is because the only

22  information he had was limited to things they already knew, his

23  experience there and his limited participation in the offense.

24              You know, I wish he would have been signed up as a

25  cooperator.  He would have been an outstanding witness.  He was

L82WdepS

1   very careful to be truthful in those proffers.  He didn't

2   minimize.  There were no issues of veracity.  He just didn't

3   know enough.  He wasn't integrated enough with the offense.  He

4   was exploited by these people, and they didn't feel the need to

5   let him in on their darkest secrets and he wouldn't, therefore,

6   have been of much use.

7              So those are all mitigating factors.  He's also, he's

8   going to tell you in a minute, he's been sober since May of

9   2018.  He struggled with drug addiction his entire life.  His

10  father struggled with drug addiction.  First, his marijuana use

11  and party drugs but eventually painkillers, which led to

12  heroin.

13             THE COURT:  But he did just about everything.

14             MR. MARGULIS-OHNUMA:  Yeah.

15             THE COURT:  Cocaine, marijuana, oxy, mushrooms.

16             MR. MARGULIS-OHNUMA:  Yeah.

17             THE COURT:  He did the range.

18             MR. MARGULIS-OHNUMA:  Yeah, and of those I think the

19  most physically debilitating is heroin, because of --

20             THE COURT:  That doesn't excuse the crime.  It helps

21  put it in context.  It doesn't excuse it.  It's good that he's

22  sober.

23             MR. MARGULIS-OHNUMA:  Right.

24             THE COURT:  He's been sober since May of 2018.

25             MR. MARGULIS-OHNUMA:  Right.

L82WdepS

1          THE COURT:  All of that's good.  Now let's talk about

2     the crime, because you wanted to talk about other things.

3          MR. MARGULIS-OHNUMA:  Oh, I thought I was talking

4     about the crime.  I was contextualizing the crime itself.

5          THE COURT:  All right.  Fair enough.  Fair enough.

6          MR. MARGULIS-OHNUMA:  I think that one thing we should

7     talk about is the future for this young man and what he's going

8     to do and where he's going to be, and I think, you know, his

9     girlfriend, Lindsay Rothman --

10          THE COURT:  Welcome.

11          MR. MARGULIS-OHNUMA:  -- has been with us all along in

12     this process and supportive of him.

13          THE COURT:  I saw that.

14          MR. MARGULIS-OHNUMA:  So since May of 2018 --

15          THE COURT:  That's very important.

16          MR. MARGULIS-OHNUMA:  So it's more than, well over

17     three years of sobriety.

18          THE COURT:  Talk to me a little bit about general

19     deterrence.

20          MR. MARGULIS-OHNUMA:  OK.

21          THE COURT:  Talk about general deterrence.

22          MR. MARGULIS-OHNUMA:  OK.  So, the studies, I think,

23     show, and I didn't cite them, but I suspect you're familiar

24     with them, that short and definite sentences, knowing you're

25     going to get busted for the crime is what deters people.

L82WdepS

1    Lengthy sentences don't add marginal deterrence, based on

2    social science, and I think -- so we're not asking for no

3    prison time, although I personally think it would be

4    appropriate.  In another world I think he would, you know, be

5    forced to continue addressing his drug problem for a really

6    long time and not go to prison but continue working

7    legitimately and taking care of his girlfriend.  But that's not

8    what he told me to ask for here, because he feels guilty and

9    thought it would be strategically better to ask for six months.

10   So we're asking for six months in prison.  That's devastating.

11            THE COURT:  No.  He's going to be going to prison for

12   a longer term than that.  I do not intend to sentence him to

13   the guideline range, even the guideline range that we now have

14   set upon, but nonetheless, it's going to be a significant

15   sentence.  It was a significant crime.  We can talk about

16   willful blindness, but he knew what he was doing.

17            MR. MARGULIS-OHNUMA:  Let me say a word about that.

18   Every extra day you give him in prison has a real impact on

19   these folks' lives.  And I want you to ask yourself, as you do

20   that -- I'm sorry, how much more deterrence are you giving him,

21   giving the world by another week, another month, another year?

22   And I think after six months, the diminishing return is very

23   great.  I mean it doesn't -- it doesn't add much to give him

24   seven or eight or nine months.

25            THE COURT:  I'm not going to give him seven or eight

L82WdepS

1     or nine months.  He's going to get more than that.

2              MR. MARGULIS-OHNUMA:  Well, I'm sorry to hear that.

3              And again, if we're on the margins, I just -- you

4     know, I'm sure you do, I hope you see the impact that that has

5     on a young man and his family and his future and the world and

6     the need for general deterrence and the dangers -- you know,

7     I've been in the prisons now -- we've been going in; we weren't

8     for a long time.  The conditions in MDC and MCC at least, and

9     hopefully he'll go somewhere that's a little better run than

10    those places.  I wouldn't even think about a federal crime in

11    today's context.  It's appalling how, the inability of the

12    Bureau of Prisons to deal with the medical crisis that we've

13    been seeing, and it's -- I mean, you know, I think a civilized

14    country shouldn't deter people that way.  I think we should

15    find a better way to deter people, but nonetheless, if you're

16    concerned about deterrence, every day more you add to him being

17    in that confined, confined context while this pandemic is going

18    on is an even greater deterrent than it would be in normal

19    circumstances.

20             THE COURT:  No.  It may be even greater punishment.  I

21    don't know about even greater deterrence.

22             MR. MARGULIS-OHNUMA:  Both, both.

23             THE COURT:  I am concerned about punishment.  I am

24    concerned about general deterrence.  The need for individual

25    deterrence here, I think, is ameliorated in part by being

L82WdepS

1    sober, and I do sense from the papers that he is indeed

2    remorseful.  But general deterrence looms large here, as does

3    punishment.

4              MR. MARGULIS-OHNUMA:  If you have no other questions,

5    I'll rest on those comments.

6              THE COURT:  No.

7              MR. MARGULIS-OHNUMA:  Mr. DePaola would like to

8    address you too.

9              THE COURT:  I appreciate your comments, and I always

10   have trouble with your name, Mr. Margulis-Ohnuma.  I apologize.

11   I should know it by now, sir.  My apologies.  I think you've

12   done with it what you can.

13             You know I sat through the Ketabchi trial.  I've seen

14   the submissions of the victims.  I've heard the victims of that

15   trial.  These scams focused on older people are devastating to

16   the lives of older people.  It's terribly unfortunate that the

17   burden of criminal wrongdoing very often falls on totally

18   innocent people.  And I'm talking about the family here, his

19   girlfriend, his friends, his family.  And obviously, that's a

20   factor, but it's the crime and the particular circumstances and

21   characteristics of the individual and all of the factors in

22   3553(a) that are important here.  And again, it's just

23   unfortunate that the family members, who very often know

24   absolutely nothing about the crime.  It actually wasn't true at

25   the sentencing earlier today, as I'm sure you're aware, where

L82WdepS

1   both the husband and the wife are defendants in the case.  But

2   that's not the situation here, and that makes it all very

3   unfortunate.  But it's not really an excuse to treat the

4   defendant differently.

5           All right.  I appreciate your comments, sir.  I truly

6   do.  Let me hear from the government.

7           Government.

8           MS. FLETCHER:  Thank you, your Honor.

9           So, as the Court knows and as the government has done

10  at virtually every sentencing in these cases, we tried to

11  assess the defendant, the appropriate sentence for any

12  individual defendant both with respect to the guidelines but

13  also by comparing them to defendants who are similarly situated

14  to them.  And so in the government's view, this is reflected in

15  our letter, the defendant who is the closest to this defendant

16  in terms of role and culpability is Andrew Owimrin.

17          As the Court will recall from Andrew Owimrin's trial,

18  Mr. Owimrin was not, was not experienced in any sort of sales

19  role prior to joining the scheme.  Like Mr. DePaola, he also

20  had a very serious drug addiction.  That drug addiction, I

21  think, informed his willingness to enter into this scheme, and

22  he received a sentence of 52 months.  Now, I think there are a

23  number of facts that differentiate this defendant from Andrew

24  Owimrin, and Mr. DePaola's counsel has focused on some of them.

25          This defendant accepted responsibility.  He pleaded

L82WdepS

1    guilty very early.  The government took the position, as the

2    Court will recall, that Andrew Owimrin perjured himself at

3    trial.  This defendant didn't do that.  He expressed a

4    willingness to cooperate quickly.  He did proffer.

5           Without going into, I think, all of the government's

6    considerations in deciding whether or not to continue to

7    proffer him, I will say I don't think we concluded that he

8    lied, but in much the same way that his counsel has said

9    "willfully blind" multiple times today, that theme ran through

10   his efforts to proffer with the government too and informed our

11   willingness to proceed.

12          And I think one other thing that differentiates him

13   from Andrew Owimrin, to the extent relevant to the Court's

14   consideration, is this entire industry is a massive scam on

15   vulnerable people, the elderly but also other vulnerable

16   people.  I don't know that there is any particular victim or

17   instance within this scheme quite like what Andrew Owimrin and

18   Ketabchi did to Jane Thompson, and that was and continues to

19   be, in the government's view, some of the most deplorable

20   conduct.

21          That conduct was referenced during the government's

22   cross-examination of Shahram Ketabchi.  That cross-examination

23   also dealt with Shahram Ketabchi's efforts to fight

24   charge-backs for victims who claimed that they had dementia.

25   So I say this both to, I think, ask the Court to contextualize

L82WdepS

whether, having viewed that cross-examination, Mr. DePaola
could have left this courtroom with anything other than a
conclusion that he was involved in fraud.  But putting that
aside, I don't believe he did, or I'm at least not aware of any
victim who was victimized by this defendant in the way that
Andrew Owimrin victimized Jane Thompson and Charlene Foster.
And so I say that, again, to give the Court the government's
view as to how this defendant should be compared to those like
him and trust that the Court will impose a fair sentence in
light of all of the facts.

        If the Court has any questions, I'm happy to answer
them.  Otherwise, we'll rest on our submissions.

        THE COURT:  All right.  Thank you.  And I take it your
submission is, as almost always, a guidelines sentence.

        MS. FLETCHER:  That is the submission, although, your
Honor, I think that the recent sentencings have made clear that
it's not always the government's position.  I believe we sought
a below-guidelines sentence for Ms. Cirilo and also for Ryan
Hult.  So the government is, is and does endeavor to be
thoughtful about whether a below- or above-guidelines sentence
is appropriate, and in this case, we believe a guidelines
sentence is appropriate.  But the Court, I think, can infer --
and when I say a guidelines sentence, I mean the guidelines of
46 to 57 months, I think the Court can infer where within that
range the government would suggest a sentence be given the

L82WdepS

1    comparison we've just made to Mr. Owimrin.

2              THE COURT:  Too much indirection.

3              Mr. DePaola, what would you like to say, sir, if

4    anything?  You don't have to say anything to me, sir.  And

5    anything you say can be used against you, but I'm hear to

6    listen to anything you want to tell me.

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Sir.

9              THE DEFENDANT:  I appreciate it, sir.

10             Good afternoon, your Honor.  I'd like to start by

11   sincerely apologizing to the victims that I defrauded.  The

12   last date that I was physically addicted to drugs and alcohol

13   was May 1 of 2018.  I do consider that date my sobriety date.

14   However, at that point, I was still engaging in the same

15   selfish and destructive behaviors that led me into heroin

16   addiction in the first place.

17             When I started working at Alliance, I was walking into

18   a place where at the time I thought I was surrounding myself

19   with a group of men living a sober lifestyle.  I built

20   relationships with these men through Alcoholics Anonymous.

21   They became my friends as well as my mentors, one of them being

22   Ryan Hult, who I referred to as coach.  He was taking me

23   through the 12 steps of Alcoholics Anonymous.  That did require

24   us having absolute trust with each other.  I saw a group of

25   people with years of sobriety, something at the time I couldn't

L82WdepS

1  imagine achieving.  I saw them living lifestyles that I also

2  desired, one with materialistic things, families, kids, and

3  that was something that I strived for.  I thought in order

4  to -- excuse me.  I'm sorry, your Honor.

5      THE COURT:  No.  Sir, this is difficult for everybody,

6  I assure you, less so for me than for your family, but none of

7  these things are easy.  As your attorney has so articulately

8  said, there are a lot of factors that go into this.  It's hard.

9  Take your time, whatever you need.

10      THE DEFENDANT:  Thank you.  I do appreciate that.

11      These things are what I thought I needed in order to

12  be living a financially stable as well as sober life.  Looking

13  back at this time in my life, I was missing the core principles

14  of what Alcoholics Anonymous actually stood for.  Just because

15  I wasn't using drugs or alcohol didn't mean that I was truly

16  sober at all.  I was dishonest and deceitful in every aspect of

17  my life, most importantly towards the victims of my crime.

18      At the time, being financially stable was something I

19  thought I needed in order to progress my life.  I've come to

20  realize that the stability in my life comes from my faith and

21  my family, not through my financial gains.  Today I aspire to

22  live a life of honesty, integrity, humility, awareness, most

23  importantly, service to others.  These are some of the

24  principles, among others, that I have been taught and

25  implemented into my life and my recovery to practice true

L82WdepS

1   sobriety.

2           Thank you for your time, your Honor.

3           THE COURT:   Thank you.

4           Mr. DePaola, you've come a long way.  I think the

5   major step you've taken is in terms of your being freed from

6   your drug habit.  No question about that.  I think it's very

7   important that you have been sober since May of 2018.  I think

8   that bodes well for you, not only for your future sobriety but

9   for your being able to live in society with a decent job.  You

10  have one now, $25 an hour as a customer service rep, if I

11  understand it correctly from the papers, with this (inaudible)

12  company, and you have a woman who's apparently stood by you

13  through all of this.

14          All of that's important.  But you knew what you were

15  doing.  I mean you admitted you knew what you were doing and

16  you obviously knew what you were doing, and you knew that it

17  was wrong and illegal and you kept at it.  And

18  Mr. Margulis-Ohnuma is right.  You were kind of led into this

19  by Hult, who was higher, much higher up on the scale than

20  you -- that is, the scale of wrongdoing in this conspiracy,

21  higher up in the leadership of the conspiracy than you.  And

22  that's unfortunate, and you were relying on him, I think, but

23  that doesn't excuse your criminality.

24          As I said, and your lawyer agreed, you didn't have

25  your own merchant account, which is a relevant thing here.  You

L82WdepS

1    didn't own a sales floor.  You were good at what you did.  You

2    helped Minetto and the other owner of the sales floor commit

3    the crimes in this conspiracy, and I just can't ignore that.

4            I am going to go below the guideline range.  In fact,

5    I'm going to go lower than I had intended to do based on the

6    presentation of your counsel.

7            My intention is to sentence you to 30 months'

8    incarceration, sir, and the other recommendations of the

9    probation department:  Three years' supervised release.  I've

10   already signed the forfeiture.

11           Government, do you have a restitution order, or are

12   you asking for additional time?

13           MS. FLETCHER:  We'd ask for 90 days, please, your

14   Honor.

15           THE COURT:  Defense, is there any objection to 90 days

16   here?

17           MR. MARGULIS-OHNUMA:  No, your Honor.

18           THE COURT:  All right.  On restitution, I'm not going

19   to order restitution now.  I'll want a submission prior to 90

20   days from now by the government and a statement by the

21   government that the defense consents.  And if the defense

22   doesn't consent, I'll want a submission from the defense in

23   regard to the government proposal, whatever that may be.

24   That's my intentions at this point.

25           Sir, if you would rise, I will impose sentence.

L82WdepS

1          Pursuant to the Sentencing Reform Act of 1984, it is

2     the judgment of this Court that the defendant, Joseph DePaola,

3     is hereby committed to the custody of the Bureau of Prisons to

4     be imprisoned for a term of 30 months.  Upon release from

5     imprisonment, Mr. DePaola shall be placed on supervised release

6     for a term of three years with the conditions recommended by

7     the probation department; namely, the mandatory conditions set

8     forth on page 28 of the presentence report plus the standard

9     conditions 1 through 12, as set forth on pages 28 through 30 of

10    the presentence report, plus the special conditions set forth

11    on page 30 of the presentence report.

12          Within 72 hours of release from the custody of the

13    Bureau of Prisons, you shall report in person to the probation

14    office in the district to which you are released.

15          I'm not imposing a fine, sir, because I find you lack

16    the ability to pay a fine after taking into account the

17    presentence report and the forfeiture order and the restitution

18    order that I almost certainly will impose approximately 90 days

19    from now.

20          I hereby order that you pay, Mr. DePaola, to the

21    United States a special assessment of $100, and that special

22    assessment is due immediately.

23          I've sentenced this defendant below the guideline

24    range.  I believe the sentence is appropriate given the

25    seriousness of the offense and the need for punishment and

L82WdepS

1    deterrence, and my variance below the guideline range is based

2    on this defendant's remorse as well as his hard-earned sobriety

3    and his gainful term of employment.

4              Mr. DePaola shall surrender for service of his

5    sentence at the institution designated by the Bureau of Prisons

6    on or before 2 p.m. on Friday, September 10.

7              Mr. Margulis-Ohnuma, are you aware of any legal reason

8    why the sentence should not be imposed as I have stated it?

9              MR. MARGULIS-OHNUMA:  I'm not, your Honor, but I do

10   have a couple of applications.

11             THE COURT:  Yes, sir.  Let me first impose sentence.

12   Then we'll deal with them.  I take it they're recommendations

13   that you're seeking.

14             MR. MARGULIS-OHNUMA:  Yeah, and also on the surrender

15   date.

16             THE COURT:  All right.  Ms. Fletcher, are you aware of

17   any reason why the sentence should not be imposed as I have

18   stated it?

19             MS. FLETCHER:  No, your Honor.

20             THE COURT:  I hereby order the sentence to be imposed

21   as I have stated it.

22             What do you want to ask about the surrender date, sir?

23             MR. MARGULIS-OHNUMA:  One moment, your Honor.  Sorry.

24             So, yeah, both the designation and the surrender date.

25   Mr. DePaola suffers from an undiagnosed obesity that makes him

L82WdepS

1    particularly susceptible, in my view, to the COVID-19 disease.

2                THE COURT:  Undiagnosed what, sir?

3                MR. MARGULIS-OHNUMA:  Obesity.  He's way overweight,

4    and that is a risk factor which he needs to be addressing and

5    is not.  We're working on that.  Also, the guidance is changing

6    daily.  I understand this morning masks were not required and

7    now they are required in the courtroom.

8                THE COURT:  Yes, sir.

9                MR. MARGULIS-OHNUMA:  The prison environment is

10   incredibly vulnerable because of the close quarters of inmates

11   that I discussed earlier in any prison that he ends up in, and

12   for all those reasons, I would ask for a 90-day surrender date.

13   Hopefully by that time the measures being, you know, taking

14   into -- being effectuated now will have had the effect desired,

15   and I'm concerned about, that he see a doctor before going to

16   prison and deal with his obesity, if possible, to protect him

17   from this deadly disease.  So I think the risk will be

18   substantially lowered by extending the surrender date to that

19   extent.

20               THE COURT:  I'll extend the surrender date until

21   November 5, but I have to say that the existence of the Covid

22   pandemic is not a reason to not be in prison.  At the

23   beginning, the prisons, I believe, really didn't know how to

24   deal with the pandemic, nor did most people.  Recently, they've

25   been handling it quite well.

L82WdepS

1          Because I'm not requiring that he surrender now and
2     I'm not requiring that he turn himself in to the marshals at
3     the Southern District of New York but, rather, that he appear
4     at the institution designated by the Bureau of Prisons, he's
5     not going to be in the MCC or the MDC.  He'll be in an
6     institution where the conditions, I would hope, are far
7     superior to those in the MDC and MCC, because in part, they'll
8     be federal correctional institutions that are not jails.  He
9     will have a lot more room.  He will have more opportunity for
10    outdoor activities.  There are essentially none here in New
11    York City in the jails.  He'll have better opportunity for
12    programming, educational and vocational programming.
13         So I'm going to do it for 90 days.  Obviously, I can't
14    stop you from making any other requests, although I'll tell you
15    my current intention is that he goes to the prison after 90
16    days.
17         MR. MARGULIS-OHNUMA:  Thank you, your Honor.  So then
18    my other application is that --
19         THE COURT:  The obesity is simply something he's going
20    to have to work on.  It's not going to be solved in 90 days if
21    it hasn't been solved in however long he's been obese.
22         MR. MARGULIS-OHNUMA:  Yes, your Honor.
23         So the other application is that if consistent with
24    his security designation, that you enter a judicial
25    recommendation that he be designated to FCI Fairton, which

L82WdepS

1    would facilitate both family visits and access to the

2    residential drug and alcohol program.

3              THE COURT:  I don't make recommendations to specific

4    institutions.  I will make a recommendation that he be housed

5    in a facility that facilitates visits with his family, who are

6    located in New Jersey, I take it.  Is that right?

7              MR. MARGULIS-OHNUMA:  It is.  But also where RDAP is

8    available is an important consideration there.

9              THE COURT:  Whether he's admitted to an RDAP program

10   or not is up to the BOP.  If he's eligible, he'll go through

11   whatever their programs are.

12             MR. MARGULIS-OHNUMA:  Judge, let me put my chips on

13   the table.  I don't want him or any other human being to go to

14   Fort Dix.  It is, and I think it's -- I'm not sure if Fairton

15   is close.  They're both in New Jersey, Fairton and Fort Dix.

16   Otisville is closer to the part of New Jersey where he's from,

17   but the Covid crisis at Fort Dix -- I've had a couple clients

18   there -- has been totally out of control.  It affects people --

19             THE COURT:  That's not true currently.  I've had some

20   current figures.  The recommendation stands, sir.  I'm not

21   going to except any particular facility.  The recommendation to

22   the Bureau of Prisons is that he be housed in a facility that

23   facilitates visits with his family, who reside in New Jersey.

24             What else?

25             MR. MARGULIS-OHNUMA:  That's all.  Thank you, your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L82WdepS

1     Honor.

2              THE COURT:  Did I ask the government whether it had

3     any legal reason why the sentence should not be imposed as I

4     have stated it?

5              MS. FLETCHER:  I believe you did, your Honor.  The

6     government does not have a legal reason.

7              THE COURT:  I hereby order the sentence to be imposed

8     as I have stated it.

9              Mr. DePaola, you have the right to appeal the

10    sentence.  If you cannot pay the cost of an appeal, you have

11    the right to apply for leave to appeal *in forma pauperis*.

12             Defense attorney, what was the limited waiver of

13    appeal rights in the plea agreement, if you know?

14             MR. MARGULIS-OHNUMA:  I think any sentence under the

15    guidelines sentence stipulated in the plea -- plea agreement,

16    so it, the waiver would be applicable.

17             THE COURT:  Was that 57 --

18             MR. MARGULIS-OHNUMA:  Yeah.

19             THE COURT:  -- or 63?

20             MR. MARGULIS-OHNUMA:  57.

21             THE COURT:  Mr. DePaola, I wish to inform you that in

22    your plea agreement you agreed to waive the right to appeal the

23    sentence and you agreed to waive the right to collaterally

24    attack the sentence if I sentenced you to 57 months or below,

25    and I've sentenced you to essentially half of that, 30 months.

L82WdepS

1      If you make a request, the clerk of court will prepare and file

2      a notice of appeal on your behalf immediately.  And in fact, if

3      you do wish to appeal, all you have to do is tell

4      Mr. Margulis-Ohnuma that.

5             And in that event Mr. Margulis-Ohnuma, I ask you to

6      file a notice of appeal on behalf of your client.

7             Mr. DePaola, do you understand your appeal rights?

8             THE DEFENDANT:  Yes, sir.

9             THE COURT:  All right.

10            Government, any underlying instruments?

11            MS. FLETCHER:  No, your Honor.

12            THE COURT:  No open counts?

13            MS. FLETCHER:  No open counts.

14            THE COURT:  All right.

15            Mr. DePaola, you're going to be fine.  You're going to

16     serve your sentence.  You're going to use it as effectively as

17     you can in terms of, you have a high school diploma.  You can

18     always get additional schooling.  Additional education will be

19     excellent for you.  I hope you have your job when you get out.

20     Certainly there will be other jobs, especially if you get other

21     education behind you.  The main thing from my standpoint, and

22     I'm not a psychologist, is that you maintain your sobriety, not

23     only, as you said, your technical sobriety but your

24     understanding of how you should rule your life, how you should

25     guide your life.  I'm not here to tell you that it's the

L82WdepS

1    12-step method of AA or not.  I just don't know enough about

2    it, but you seem to really have a handle on it, sir.  I think

3    the main thing for me to tell you is from now on it's all going

4    to be up to you and you don't have to come under the influence

5    of any Ryan Hult or anyone else.

6              Any of that make sense?

7              THE DEFENDANT:  Absolutely, your Honor.

8              THE COURT:  I don't want to see you here again, sir.

9    That's not a threat.  That's a hope that you're going to be

10   successful.

11             Good luck to you.

12             THE DEFENDANT:  Thank you.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25